CHARLOTTE COPY DATA, INC. v. HABBAL, 1997 NCBC 4

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| COUNTY OF MECKLENBURG | SUPERIOR COURT DIVISION |
| | 96-CVS-694 |

CHARLOTTE COPY DATA, INC.,

        Plaintiff,

vs.

FADI RACHID HABBAL,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

ORDER GRANTING SUMMARY JUDGMENT

{1} On Thursday, August 7, 1997, the undersigned heard plaintiff Charlotte Copy Data, Inc.'s ("CCD") Motion for Summary Judgment for specific performance, seeking to compel defendant Fadi Rachid Habbal ("Habbal") to deliver his 113 shares of $1.00 par value common stock of CCD to CCD in exchange for payment for same in accordance with the terms of the Restrictive Stock and Non-Competition Agreement dated January 11, 1989, among CCD, Habbal and certain other shareholders of CCD (the "Restrictive Stock Agreement" or the "Agreement"), attached to the Verified Complaint as Exhibit 2. After having considered the Verified Complaint and exhibits thereto, the Affidavits filed in this action, the Briefs submitted by the parties and the arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

{2} 1. CCD, incorporated on December 1, 1988, as a North Carolina corporation, was organized for the purpose of marketing and selling copy machines, office supplies and related products and services.

{3} 2. CCD's majority shareholder is Copy Data, Inc., a North Carolina corporation owning 1,000 shares of CCD stock issued on or about December 1, 1988. Khalil Kardous ("Kardous") is the sole shareholder of Copy Data, Inc. and is also director, president and secretary of CCD.

{4} 3. Kardous formed both Copy Data, Inc. and CCD by arranging for all of the financing necessary to start the businesses, which he personally guaranteed. Although Copy Data, Inc. could have remained the sole shareholder of CCD, Kardous offered a few key employees an ownership interest in CCD to give them extra incentive to promote the growth of CCD and an opportunity to participate financially in the growth of CCD while an employee.

{5} 4. By a subscription letter dated January 11, 1989, Habbal committed to acquire 113 shares of the $1.00 par value common stock of CCD (the "Shares"). Before committing to purchase the Shares, Habbal participated in several months of discussions with other perspective shareholders-employees and CCD regarding the terms of the purchase.

{6} 5. In January of 1989 when Habbal committed to purchase the Shares, four other individuals who, like Habbal, were employed by CCD did likewise. Habbal and these individuals - - Joseph P. Gamble, Charalabos Tsiabassi, Perry Randall Sides and Carl Barry Houser - - constituted all of the minority shareholders of CCD.

{7} 6. In conjunction with the purchase of CCD stock, Habbal and the other minority stockholders entered into the Agreement with CCD, the purpose of which was, among other things, to impose certain

restrictions on each shareholder's ability to transfer the shares of stock of CCD owned by him, and to provide certain purchase options for CCD.

{8} 7. Section 3.2 of the Agreement provides that upon termination of a stockholder's employment with CCD, for whatever reason, CCD shall have the option for a period of ninety (90) days after the date of such termination to purchase all, but not less than all, of the shares of stock owned by such stockholder at a price equal to the number of shares of such stock multiplied by the book value per share.

{9} 8. To exercise CCD's option under Section 3.2 of the Agreement, two events were required: (1) stockholders owning at least 50% of the issued and outstanding stock had to approve CCD's exercise of its option; and (2) CCD had to give notice to the stockholder whose employment had terminated that CCD was exercising its option under the Agreement.

{10} 9. Habbal, an employee-at-will, as are all of CCD's employees, was terminated from employment on October 24, 1995.

{11} 10. At a special meeting of stockholders held on November 21, 1995, the stockholders of CCD voted to authorize CCD's exercise of its option to purchase Habbal's Shares under section 3.2 of the Agreement. Habbal was given notice of the meeting.

{12} 11. On November 22, 1995, CCD gave written notice of the exercise of its option to purchase Habbal's Shares pursuant to the Agreement with the closing set for December 15, 1995.

{13} 12. On October 31, 1995, approximately three weeks prior to the special shareholders meeting, Habbal presented notice to CCD that a Mr. Clement Ramdin had offered to purchase the Shares from Habbal (the "Ramdin notice"). Although the Ramdin Notice was not timely given pursuant to the Agreement, at the special meeting of shareholders, CCD agreed to allow Habbal to sell his Shares to Mr. Ramdin provided that, among other things, Habbal did so before December 10, 1995, and if Habbal did not close by that date, CCD would purchase such shares pursuant to exercise of its option under the Agreement.

{14} 13. The sale to Mr. Ramdin never took place, and on December 15, 1995, CCD was ready and willing to consummate the purchase of Habbal's Shares as set forth in Section 3.2 of the Agreement which required CCD to pay Habbal the book value per share multiplied by the number of shares owned by him.

{15} 14. Calculated in accordance with Section 4.1 of the Agreement, such amount was $66,286.93, based on the statement by the accountant for CCD of the book value per share of the common stock issued and outstanding in accordance with generally accepted accounting principles.

{16} 15. In accordance with the Agreement at the closing, CCD was required to pay Habbal twenty percent (20%) of the total price, with the balance to be paid in four (4) equal annual installments of principal together with interest. On December 15, 1995, CCD duly performed its obligations under the Agreement by tendering a check payable to Habbal in the amount of $13,257.39, which amount represented twenty percent (20%) of the purchase price of the Shares.

{17} 16. Habbal did not appear at the closing and since December 15, 1995, has continued to refuse to deliver the stock certificate for the Shares or to accept payment tendered by CCD.

{18} 17. As of year-end September 30, 1995, there were 1,282 total shares issued and outstanding of CCD common stock and the total book value was $752,038.00 or $586.61 per share.

{19} 18. Habbal, with the other stockholders, received year-end financial statements from which book value per share could be calculated as done for year-end September 30, 1995. The book value per share of the 1,282 issued and outstanding shares of common stock increased from $78.11 per share in 1991 to $586.61 in 1995.

{20} 19. On January 19, 1996, CCD filed suit for specific performance of the Agreement in the Superior Court of Mecklenburg County, and on October 9, 1996, the case was transferred to the undersigned.

{21} 20. On December 19, 1996, plaintiff served defendant with Plaintiff's Request for Admissions (the "Admissions"), which included the following paragraph 10:

> 10. The book value, as defined in Section 4.1 of the Restrictive Stock and Noncompetition Agreement, is computed by dividing the net worth ($752,038.00) by the number of shares outstanding (1,282) for a book value per share of $586.61.

{22} Defendant failed to respond to the Admissions within thirty days and filed no motion with the court setting forth excusable neglect on the part of defendant in failing to respond to plaintiff's request.

## CONCLUSIONS OF LAW

{23} NOW, THEREFORE, based upon the foregoing Findings of Fact, the court makes the following Conclusions of Law:

{24} 1. The court has jurisdiction of the subject matter and parties, and the court has the authority to enter the order hereinafter set forth.

{25} 2. The Agreement is enforceable under North Carolina law. N.C. Gen. Stat. § 55-6-27. The preamble of the Agreement clearly articulates a reasonable purpose of insuring that current shareholders of CCD, a closely held corporation, will be able to control who participates in CCD's business in order to preserve continuity in the management of CCD, which is clearly compatible with N.C. Gen. Stat. § 55-6-27(c). The provisions of the Agreement providing CCD with the option of requiring resale of an employee's stock to CCD, upon the termination of the at-will employee, are reasonably related to an authorized purpose, as specified in N.C. Gen. Stat. § 55-6-27(d)(5).

{26} 3. The Agreement read as a whole and with reference to the specific language evidences a clear intent that book value per share be determined by dividing net worth by all outstanding shares according to generally accepted accounting principles.

{27} 4. Book value typically is used to establish the purchase price at which a close corporation will purchase its shares where no outside market exists for the shares. Rowland v. Rowland, 102 Idaho 534, 633 P.2d 599 (1981).

{28} 5. Book value of a share of stock, in its simplest form, is the corporation's assets minus its liabilities as shown on the corporate books, divided by the number of shares of stock outstanding. 1 F. O'Neal & R. Thompson, O'Neal's Close Corporations, § 7.27(3)(d) (1996).

{29} 6. Habbal was competent to contract and did so contract to be required to sell his Shares of stock to CCD upon termination of his employment at the book value per share determined pursuant to generally accepted accounting principles.

{30} 7. Book value per share of stock has been appropriately determined in this case to be $586.61 per share pursuant to generally accepted accounting principles. Moreover, Habbal has admitted that book value has been correctly determined and that the book value per share is $586.61 pursuant to defendant's judicial admission to paragraph 10 of the Admissions:

> The book value, as defined in Section 4.1 of the Restrictive Stock and Noncompetition Agreement, is computed by dividing the net worth ($752,038.00) by the number of shares outstanding (1,282) for a book value per share of $586.61.

{31} 8. The unanswered Admissions eliminate any potential ambiguity in the language of the Agreement

and therefore any material dispute of fact in this case, thus making summary judgment appropriate. See, e.g., Whitly v. Coltrane, 65 N.C. App. 679, 309 S.E.2d 712 (1983); Interstate Hwy. Exp. v. S & S Enterprises, Inc., 93 N.C. App. 765, 379 S.E.2d 85 (1989).

{32} 9. Plaintiff has met its burden of showing that there is no dispute as to any material fact and that summary judgment is appropriate as a matter of law. Ruff v. Reeves Bros., 122 N.C. App. 221, 224, 468 S.E.2d 592, 595 (1996).

## ORDER OF THE COURT

{33} Based upon the foregoing Findings of Fact and Conclusions of Law, it is hereby ordered, adjudged and decreed that plaintiff's Motion for Summary judgment is granted and that plaintiff is entitled to specific performance of the Agreement. Therefore, defendant shall deliver his stock certificate for 113 shares of stock, duly endorsed and transferred to Charlotte Copy Data, Inc., within thirty-one days of entry of this Order, at which time upon notice of delivery properly given to CCD, it will have a check made payable to defendant in the amount of $13,257.39, representing twenty percent of the purchase price of the Shares pursuant to Section 4.1 of the Agreement. Defendant shall accept payment of the balance in four (4) equal annual installments of principal together with interest as set forth in Section 4.1 of the Agreement as if Habbal had complied with his duty under the Agreement on December 15, 1995, to tender the Shares to CCD. Therefore, one annual installment of principal together with interest will be accepted by Mr. Habbal for the period from December 15, 1995 to December 16, 1996, and thereafter annual installments will be accepted pursuant to paragraph 4.1 of the Agreement until the principal amount of $66,286.93 has been received.

{34} The costs of this action shall be taxed against the defendant.

This the 11th day of November, 1997.